## JONES v. THOMPSON *et al.*

No. 4905.    Opinion Filed January 25, 1916.

(154 Pac. 1139.)

1. **APPEAL AND ERROR** — Continuance — Discretionary Ruling. The granting or refusing of a continuance on account of the absence of counsel is a matter of discretion with the trial court, and, unless it appears that such ·discretion was abused to the prejudice of the substantial rights of a litigant, the action of such court will not be disturbed upon appeal.

2. **APPEAL AND ERROR**—Review—Weight of Evidence—Fraud— Equity. While the rule prevails in this jurisdcition that in cases of purely equitable cognizance it is within the power of this court to consider the entire record, weigh the evidence, and, where the judgment of the trial court is clearly against the weight of the evidence, to render or cause to be rendered such judgment as should have been awarded by the trial court, yet the doctrine is equally well established that where fraud is relied upon as a basis for equitable relief, and the trial court, after hearing the evidence, finds that fraud has not been established, this court will not disturb such findings, unless. it is clearly against the weight of the evidence.

(Syllabus by Bleakmore, C.)

*Error from District Court, Pawnee County;*
*L. M. Poe, Judge.*

Action by Julia A. Jones against E. M. Thompson and others. Judgment for defendants, and plaintiff brings error. Affirmed.

*Harris & Nowlin* and *Burford, Robertson & Hoffman,* for plaintiff in error.

*William Blake* and *Burwell, Crockett & Johnson,* for defendants in error.

Opinion by BLEAKMORE, C.   This action was commenced in the district court of Pawnee county by the plaintiff in error against the defendants in error, seeking the cancellation of certain written instruments on the ground that at the time of the execution thereof plaintiff had been stupified by some drug surreptitiously administered by one of the defendants, which rendered her mentally incapacitated to understand and appreciate the nature of the transaction, and, while her faculties were thus impaired, she was fraudulently induced to execute such instrument.

The plaintiff, a woman 65 years of age, was the owner of 155 acres of land in what is known as the Cleveland oil field in Pawnee county, which she had theretofore leased to the Minnetonka Oil Company for a royalty of one-eighth of the oil; such royalty, from three wells, having for some five years afforded her an average monthly income of about $50, and for the month of March, 1912, $114.   The land was practically valueless for agricultural purposes.   An oil well then being drilled to a deeper sand on an adjoining tract was producing a large amount of gas and spraying some oil.   On March 19, 1912, while plaintiff was visiting her daughter, who resided on the land involved, the defendant E. M. Thompson, a physician, called upon her there and offered $500 for an option to purchase a one-half interest in said land and royalty; such option to be exercised within nine months by the payment of an additional sum of $3,500.   Plaintiff declined to enter into any contract at the time, stating

that she desired to consult her children in regard to the matter. She and defendant Thompson had some conversation over the phone that night or the following morning relative to such proposition; she still refusing to make any agreement for the sale of the property. On the next day defendant Thompson again called upon her at the same place, stating that he was on his way to see an oil well upon the adjoining tract, and asking her to be ready upon his return to accompany him to the town of Cleveland, where they both resided. He came back from the well, and the plaintiff went with him to said town. Defendant took her to his home, where she ate dinner and thereafter executed to the defendant Emma M. Thompson, the wife of the doctor, in consideration of $500 cash, a contract for the conveyance of an undivided one-half interest in said land and the royalties therefrom, to be executed and delivered at any time within 9 months upon the payment to her of an additional sum of $3,500; and also a deed to such one-half interest in said land and royalties, which it was agreed should be placed in escrow to be delivered upon the payment to the plaintiff of said additional sum within a period prescribed. The instruments were prepared by one Stanley Edmister, a lawyer and notary public, who resided at Cleveland. At the Thompson home at the time of the execution of said instruments were the plaintiff, the defendants Dr. Thompson and his wife, a Mrs. Moore, who, on account of the illness of Mrs. Thompson, had been called in to prepare the meals and perform the general household duties, her daughter, a child of about 11 years, and StanleyEdmister, who arrived at about the time the others had concluded the noon meal and who brought with him the contract and conveyance, which he had previously prepared.

Shortly after eating dinner·plaintiff signed said instruments and received a check for $500 from Mrs. Thompson, and also copies of the instruments. Edmister then retired, taking with him the original instruments to be deposited in escrow, and the doctor also left, ostensibly to see a patient. Thereafter, about 3 o'clock, he returned and took the plaintiff in his buggy to the bank, upon which·the check was drawn, where she alighted from the buggy, entered the bank, indorsed and deposited the check, and received a passbook, upon which she was given credit therefor, and was driven by the doctor to her home in the town of Cleveland. The contract and deed were placed in escrow in the bank by Edmister.

On March 27th, seven days thereafter, plaintiff went to the office of the defendant Dr. Thompson and informed him that she had previously executed deeds to the land in question conveying 80 acres thereof to her daughter, Mrs. Kinney, and 80 acres thereof to another daughter, Mrs. Newman, who at the time had reconveyed the same to her, and that their conveyances were in the possession of a Mr. Gilbert for her whenever she desired them. Whereupon the following instrument was prepared, which plaintiff dictated and acknowledged and signed:

"STATEMENT OF JULIA A. JONES CONCERNING HOMESTEAD.

"Section twenty, Township twenty-one (21), Range eight (8), East I. M., in Pawnee county, Oklahoma, containing 155 acres. The west half (W. ½) of the said land was deeded to Grace L. Kinney and the east half (E. ½) to Virgie A. Newman. The object, an assignment for protection. It was for a protection of an enormous attorney fee. They gave .me a deed which is in escrow with Mr. Gilbert. This was to prevent the collection of what I considered an unjust claim for attorney

fee. I did not make this as a transfer of my interest, only for that reason. It was understood by the girls that I held the ownership of the land, while they held the naked legal title, and for my protection the girls made deeds back to me, which are with Mr. Gilbert and which I was to have the privilege of securing for the purpose of placing on record at any time. Mr. Gilbert understanding this and I trusting him fully in the matter.

"JULIA A. JONES."

"Witnesses:

"BERTA ARNETT.

"S. C. EDMISTER.

"State of Oklahoma, County of Pawnee, ss.

"Before me, Berta Arnett, a notary public, in and for said county and state on this 27th day of March, 1912, personally appeared Julia A. Jones, to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that she executed the same as her free and voluntary act and deed for the uses and purposes therein set forth.

"Witness my hand and notarial seal the day and year last above written.

"[Seal]          BERTA ARNETT, *Notary Public.*

"My commission expires March 21, 1915."

Immediately thereafter plaintiff accompanied the defendant Dr. Thompson to the office of Mr. Gilbert and procured said deeds and delivered them to him. Later defendant deposited to the credit of the plaintiff in the Cleveland National Bank $3,500, and the deed involved was delivered. Emma M. Thompson thereupon conveyed to the defendant Mullendore a one-fourth interest in said property, he having been previously informed of the transaction with plaintiff and agreeing to purchase the said interest for $2,000. Wells upon the adjoin-

ing property were drilled into deeper sands, as were the wells upon the property in controversy, which greatly increased the value thereof, at the time of the trial in October, 1912; various opinions as to such value being offered, ranging from $20,000 to $80,000.

Plaintiff insisted that she had been drugged by some substance administered to her by Dr. Thompson or at his instance, in the food or drink of which she had partaken at his home shortly before making the said contract and deed, the effect of which rendered her dizzy, partially blind, sleepy, and dull, and affected her mentally to such an extent that, as expressed by her, she did not have mind enough to know what she wanted to do, and after she reached her home she lost consciousness entirely; that in the execution of the contract and during the entire transaction she was not acting of her volition, but was dominated entirely by the defendant Dr. Thompson.

Some days after the transactions involved plaintiff stated to E. G. Todd, mayor of the town of Cleveland, who desired to purchase an interest in the royalty derived from the land in question, that she had sold a portion thereof to defendants and did not care to sell any more. She also stated to one Shepherd, an acquaintance residing in Cleveland, that she had made the sale to defendants, and although she had been told that she sold too cheap, yet she was satisfied.

All the persons present at the Thompson home when the instruments in question were executed, as well as a Mrs. Long, who called there a short time thereafter and saw and talked with the plaintiff, and S. A. Bryant, vice president of the Cleveland National Bank, who

received the deposit of the $500 check and conversed with the plaintiff at the time, testified that there was nothing unusual in her appearance or demeanor.

The court made elaborate findings of fact, among which are:

XXI. "That at the time of the execution of this option contract, there were three producing wells on the plaintiff's land, and one gas well, and said gas well probably produced a litle oil; that these wells had been drilled some five or six years prior to said date to what is known as the Cleveland sand; that her royalties from production of said wells was an average of $50 per month. That the total value of said land based upon settled production and independent of speculative values, taking into consideration the fact it was covered by the Minnetonka Oil Company's lease, and that only one-eighth of the production would go to the purchaser of the land, could not exceed $3,000; that said land had little value for agriculture, there being only a few acres of tillable land on the premises."

XXII. "That the plaintiff at the time of the execution of the option contract had knowledge of the fact that one of these old wells that had been drilled five or six years prior to said date was being drilled to deep sand, and she had knowledge of the fact that the Miller well had been drilled into the deep sand and was producing gas and spraying oil, and with knowledge of this condition and without misrepresentation upon the part of the defendant, she voluntarily executed this option."

XXIII. "That she was not drugged, nor was she deceived, nor was there any undue influence exerted over her so far as the evidence in this case discloses."

The cause had been regularly set for trial on October 8, 1912. On that day and the day before the plaintiff, by her attorneys, Harris & Nowlin, applied to the

court for a postponement until some day after October 15th, because of the alleged unavoidable absence of her counsel, Hon. S. H. Harris, whose duties as general counsel for the Pioneer Telephone & Telegraph Company required his attendance before the Corporation Commission of the State of Oklahoma in another proceeding. Such application was supported by the affidavit of the plaintiff, in which it is set forth that while she had nominally employed the law firm of Harris & Nowlin to represent her, yet in fact she had employed only Mr. Harris, on account of his reputation and because of her personal preference; that she had consulted alone with him and he was her only counsel familiar with the facts and circumstances of the case and prepared to take charge and conduct the trial thereof, etc. Accompanying the application was also the affidavit of Mr. Nowlin, of the firm of Harris & Nowlin, to the effect that he had never consulted with the plaintiff with reference to the matters in controversy; that Mr. Harris alone was prepared to try the case, and stating the cause of his absence. The motion for continuance was overruled. There are many assignments of error; those particularly urged in the brief being (1) error in overruling the motion for a postponement of the trial, and (2) failing to render judgment for plaintiff and giving judgment for defendants.

Upon the trial plaintiff was represented by Mr. Nowlin and the law firm of Biddison & Merritt.

From an examination of the voluminous record, consisting of more than 700 pages, we are persuaded that the plaintiff's cause was fully and ably presented and her interests protected by the attorney who participated in the trial, and that her substantial rights were not prejudiced by the absence of her other distinguished counsel.

As a general rule the granting or refusing of a continuance is a matter of discretion with the trial court, and, unless it appears that such discretion was abused to the prejudice of the substantial rights of a litigant, the action of such court will not be disturbed upon appeal. In *Pierce v. Engelkemeier,* 10 Okla. 308, 61 Pac. 1047, sustaining the action of the trial court in refusing a continuance on account of the absence of counsel on account of illness, it was said:

"The sickness of an attorney is not one of the statutory grounds entitling a party to a continuance, and it has been repeatedly and often held that an application for continuance, under circumstances like the present, is discretionary with the court."

"The courtesy existing between members of the bar, and recognized by trial courts, will usually in such cases enable counsel to postpone the cause for a few days in one of the courts so as to enable him to be present at both trials. But this is purely a matter of grace and not of law. The rights of litigants in one court are not to be determined by the condition of the docket in another, nor because an opposing counsel has assumed duties in different courts, which may conflict." 9 Cyc. 102; *Vance v. Territory,* 3 Okla. Cr. 208, 105 Pac. 307; 6 R. C. L. 549; *Roper v. U. S.,* 7 Ind. T. 185, 104 S. W. 584; *Sharman v. Morton,* 31 Ga. 34.

The prevailing rule in this jurisdiction is that in all cases, such as this, which were formerly cognizable in a court of chancery, this court has the power upon appeal to consider the entire record, to weigh the evidence, and, when the judgment of the trial court is clearly against the weight of the evidence, render, or couse to be rendered such judgment as that court should have rendered. *Schock v. Fish,* 45 Okla. 12, 144 Pac. 584; *Tucker v. Thraves,* 50 Okla. 691, 151 Pac. 598; *Wimberly v. Winstock,* 46 Okla.

645, 149 Pac. 238.   Yet the doctrine is equally well established that:

"Where fraud is relied upon as the basis for equitable relief and the trial court, after hearing the evidence, finds that fraud has not been established, the appellate court will not disturb such finding, unless it is clearly against the weight of evidence." (Overstreet v. Citizens' Bank, 12 Okla. 383, 72 Pac. 379.)

Upon consideration of the entire record herein, we cannot say that the findings and judgment of the trial court are clearly against the weight of the evidence; but, on the contrary, we are of opinion that the court below correctly found therefrom that plaintiff was not drugged, as she claimed, but voluntarily executed the instruments which she seeks to cancel, relying upon her knowledge of existing conditions relative to the sinking of the wells on her own and adjoining land, and exercising her independent belief as to the probable outcome of such development, uninfluenced by concealment, deception, misrepresentation, or other inequitable artifice or conduct on the part of defendants.   It is apparent that plaintiff at the time was in a situation to form an independent judgment concerning the entire transaction, and having done so, and acted thereon knowingly and intentionally, the fact that those wells, of the drilling of which she was fully aware, shortly thereafter reached a new and rich sand, greatly enhancing in value the property involved, affords no ground for the interposition of a court of equity and the cancellation of her conveyance thereof.

The judgment of the trial court should be affirmed.

By the Court:   It is so ordered.